IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**BRIAN JONES AND NICK HODGES,**

**Plaintiffs,**

**v.**                                                    **Case No. 14-2616-JAR-KGG**

**BNSF RAILWAY COMPANY,**

**Defendant.**

## MEMORANDUM AND ORDER

Plaintiffs bring this action pursuant to the Federal Railroad Safety Act[1] ("FRSA"),

against BNSF Railway Company ("BNSF").  Plaintiff Brian Jones alleges BNSF retaliated

against him for reporting an altercation with a fellow employee and for obtaining a restraining

order against that employee.  Plaintiff Nick Hodges alleges BNSF retaliated against him for

reporting verbal threats made against Jones by another employee in the same altercation.  This

matter is before the Court on BNSF's Motions for Summary Judgment (Docs. 16, 19) on

Plaintiffs' claims.  For the reasons discussed in detail below, the Court grants BNSF's motions

and dismisses Plaintiffs' Complaint.

### I.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In

applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact

---

[1] 49 U.S.C. § 20109.

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

reasonable jury could return a verdict for the nonmoving party."[4]  A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue

of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the

non-moving party.'"[6]

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[11]

---

[4]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]   Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]   In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II.    Uncontroverted Facts

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiffs.  Plaintiff Brian Jones is presently employed by BNSF as a signal maintainer.  At the time of the events leading to this lawsuit, Jones and Plaintiff Nicholas Hodges were employed by BNSF as laborers at the South Maintenance Terminal in Topeka, Kansas (the "SMT").  Shawn Semple was a laborer trainer at the SMT, but worked out of a cubicle in office space shared with BNSF management.  Semple had a reputation with other BNSF employees for being aggressive.

---

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

*The March 22, 2013 Altercation*

On Friday, March 22, 2013, Jones, Hodges, and Ryan Hayes were standing outside of Building 12 of the SMT, having a conversation about a union meeting that took place the day before.  Semple approached the three men and asked them what they were talking about.  Jones replied, "none of your business, you are from upstairs."  Semple repeated his question and Jones again replied that it was none of Semple's business.  Hodges also told Semple "none of your business" after Semple asked the men what they were talking about.  Although Semple was also a rank and file union member, neither Jones nor Hodges wanted Semple to know what was talked about at the union meeting because they thought Semple was providing information regarding the union meetings to management.

Following this initial exchange, Jones testified that Semple said, "why don't you go to the gym so I can work you over."  Jones then told Semple to "take his scruff back upstairs," to which Semple replied with a statement about Jones's mother.  Jones turned to Semple and asked, "what did you say?" then walked away after he did not receive a reply.

Jones then proceeded to Building 10 at the SMT, got into a forklift, and drove towards his work station in Building 11 of the SMT.  On the way, Jones again encountered Semple, and the two men had words.  According to Jones, Semple was fifteen feet away as he drove the forklift, and as he passed, Jones honked his horn and stated, "get out of the way."  According to Semple, Jones passed within two feet of him and uttered an expletive while telling Semple to get out of the way.

Jones and Semple then encountered each other yet a third time that day on the floor of Building 12.  According to Semple, Jones abruptly turned when he noticed Semple, walked directly up to him, swore at him and said, "nobody likes you."  According to Jones, he merely

4

told Semple to "smile," whereupon Semple swore at him and threatened him.

After the third encounter, the men immediately walked to the office of supervisor Rickie Johnson, where they proceeded to recount their respective versions of the altercation. General Foreman Paul McLeod heard raised voices in Johnson's office, at which time he entered the office, separated Jones and Semple, and had them write statements.[17]  Jones testified that at this point, he believed he was going to be charged with a rules violation.

McLeod also obtained written statements from the two witnesses to the initial encounter, Hodges and Hayes.[18]  Both men stated that during the initial encounter, Semple told Jones to meet him at the gym after work to "work him over."  Hodges also stated that Jones then walked away and Semple called him a "pussy."

*The TRO and Subsequent Removal From Service*

The following Monday, March 25, 2013, Jones applied for a Temporary Restraining Order ("TRO") against Semple in the District Court of Shawnee County, Kansas.  The TRO was issued the next day and stated that Semple could not "enter or come on or around . . . the workplace" of Jones.  A hearing to make the restraining order permanent was set for April 4, 2013.  On March 26, 2013, Jones provided a copy of the TRO to the BNSF police, and local managers at the SMT were contacted about the TRO by an officer.  That day, Jones also reported the encounter to BNSF through its hotline.

On March 27, 2013, Curtis Meyers, the Superintendent of the SMT, removed both Jones and Semple from service, with pay, pending the outcome of the final TRO hearing set for April

---

[17]Doc. 18, Exs. 11, 13.

[18]*Id.*, Exs. 12, 14.

5

4.[19]  Meyers testified that he thought it would be unfair to pull Semple out of service and  not

Jones, because he only had one version of the event:

> I had two people telling me different stories in that they were similar in the
> fact that it became a verbal altercation, so at that point in time I had a
> restraining order one employee put against another employee.  I couldn't
> have that other employee there until I found out the facts.  It would have
> been the fair thing to do to remove them both, pay them full wages, no
> marks, no history, nothing against either one's record until the hearing.[20]

BNSF policies and procedures state that employees may be taken out of service pending an

investigation of potential workplace violence or threats.[21]  John Free, Jones's union

representative, informed Jones that it was possible that he would be taken out of service.

At the TRO hearing in April, Jones dismissed his request to make the TRO permanent.

Jeanne Artzer, BNSF's Manager of Human Resources in Topeka, prepared a Report of Internal

Investigation Workplace Violence.[22]  Artzer determined that the incident was a mutual

altercation and that both Jones and Semple should be returned to service, and recommending

further investigation of the altercation.  As part of her investigation, Artzer interviewed

Hodges.[23]

*BNSF Investigation Hearing*

Under the applicable collective bargaining agreement ("CBA"), a BNSF employee with

more than sixty days of service cannot be disciplined until an investigation hearing is held.  An

investigation hearing is typically presided over by a BNSF supervisor.  An employee is entitled

---

[19]The Out of Service letter sent to both Jones and Semple stated:  "Effective immediately you are withheld from service, with pay pending the outcome of a District Court hearing for temporary order of protection scheduled for April 04, 2013 at 1:30 p.m.  You will be notified on recall to work.  Doc. 18, Exs. 17, 18.

[20]Doc. 18, Ex. 4.

[21]*Id.*, Ex. 20.

[22]*Id.*, Ex. 21.

[23]*Id.*

to be represented by a union official of his choosing at the investigation hearing, and is allowed

to call and question witnesses and present evidence on his own behalf.  Following an

investigation hearing, the conducting officer reviews a transcript of the hearing, along with any

documentary evidence introduced during the hearing, then makes a disciplinary recommendation

to the supervisor in charge.  The supervisor then typically determines the ultimate discipline that

will issue, and can override the recommendation of the office how presided over the

investigation.

BNSF's Policy for Employee Performance Accountability ("PEPA") governs the

particular discipline that is administered for rule violations.  PEPA is a progressive disciplinary

policy.  BNSF Rule 28.7 states in relevant part that "BNSF employees must not enter into

altercations with each other."[24]  On April 16, 2013, Jones and Semple were notified that BNSF

would conduct an investigation into the altercation of March 22, 2013, to determine whether

Jones and/or Semple violated Rule 28.7.[25]  The investigation hearing was scheduled for April 19,

2013, but was continued at the request of Jones's union representative.

Because Superindendent Meyers thought there would be a conflict of interest if a

manager at the SMT acted as the conducting officer at the investigation hearing, Mark Stockman

conducted the investigation.  Stockman, who has conducted several hundred investigations,

works at BNSF's Argentine and Murray Yards in Kansas City, and had no prior knowledge of

the altercation.

At the May 15, 2013 hearing, Jones was represented by a union official.  Both Jones and

his union representative were allowed to question all witnesses, present witnesses, and examine

documentary evidence.  Hodges testified at the hearing, and again relayed that Semple told Jones

---

[24]*Id.*, Ex. 25.

[25]*Id.*, Exs. 26, 27.

to meet him at the gym so he could "work him over."  Hodges further testified that he did not feel that either Semple or Jones was acting in a threatening manner during this initial encounter, and after Semple made the comment, Jones simply turned and walked away.  Jones was also given the opportunity to make a closing statement.

Following the hearing, Stockman recommended to Meyers that both Jones and Semple receive a Level-S Serious violation, a thirty-day record suspension, and a one-year probationary period, the typical discipline imposed for violations of rules relating to workplace altercations. Meyer's final disciplinary determination was the same for both Jones and Semple and was less severe than Stockman's recommendation: both were found to have violated Rule 28.7, and both received a formal reprimand, a one-year probationary period, and a referral to BNSF's Employee Assistance Program.[26]  A formal reprimand is the least serious form of discipline administered to employees under PEPA.

*Jones's Promotion*

Following the altercation, Jones applied for and received the position of signal maintainer, which resulted in a pay raise from $21 per hour to $26.01 per hour.

*Jones's Procedural History and Claims*

On April 5, 2013, Jones filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that BNSF violated the FRSA by disciplining him for engaging in an altercation with Semple on March 22, 2013, and by holding him out of service, with pay, while the altercation was investigated.  On November 18, 2013, OSHA dismissed Jones's complaint.  Jones sought review of OSHA's decision before an Administrative Law Judge in the United Stated Department of Labor, but opted to "kick out" his claim on October

---

[26]*Id.*, Exs. 29, 30.

23, 2013.  This FRSA retaliation action was filed in the United States District Court on

December 10, 2014.

*Hodges's Background and Applications for Promotion*

Hodges was nineteen years old when he was hired by BNSF in 2011 as a shop laborer.

At the time of the March 2013 altercation, he was twenty-one years old.  Hodges graduated high

school in 2009.  He does not have a vocational license, has not attended a trade school, and does

not have any technical certificate or degree.  Prior to working at BNSF, Hodges worked at a gas

station as well as his grandfather's farm, where he assisted with mechanical duties.  His position

as a shop laborer did not involve any kind of mechanic work.  In February 2012, Hodges

requested a transfer to BNSF's Springfield, Missouri facilities, where he has family in the area.

He transferred to Springfield in February 2014, where he obtained the position of machinist

apprentice.

Jeanne Artzer participates in the hiring of applicants for non-exempt positions.  Between

March 22, 2013 and the present, Artzer had sole responsibility for selecting interviewees for job

openings at the SMT.  Artzer conducts forty or more interviews per month, and approximately

500 interviews per year.  For an opening in a craft position such as a machinist apprentice, Artzer

normally receives 100 to 200 applications, from which she normally selects ten to fifteen

candidates to interview.  In vetting applicants for the machinist apprentice position, Artzer looks

for individuals who have 1) studied diesel mechanics at a technical school; and 2) had more than

two years' experience working as a mechanic.  While Artzer conducts the interviews and makes

recommendations on hiring decisions Superintendent Meyers has the ultimate decision making

authority as to whether an interviewee is hired.

Before his transfer to Springfield, Hodges unsuccessfully applied for numerous machinist

apprentice positions at the SMT.  In January 2012, Hodges interviewed with Artzer and Rickie

Johnson for a machinist apprentice position, but was not selected.  He received a "3" in the

section for "Work Experience and Training," which indicates "limited or no experience working

with heavy machinery."

Hodges applied for another machinist apprentice position at the SMT in January 2013,

but was not selected.  BNSF hired Michael Meier and Bryan Vandevord for this position.  Meier

had worked as a machinist for nearly six years, and Vandevord had a degree in diesel and heavy

equipment maintenance.   Hodges applied again in June 2013, but was not selected for the

position or an interview.  BNSF hired Joshua Howlett, who had worked as a heavy machinery

mechanic for approximately twelve years.  Hodges applied yet again in August 2013, but was not

selected nor interviewed.  BNSF hired Tony Marusenko, Michael Shelton, and Robert Tidball.

Marusenko had a degree in automotive technology and worked as a vehicle technician for six

years; Shelton had six years' experience as a fleet mechanic; and Tidball had a degree in diesel

technology and prior experience as a heavy equipment mechanic.

In August and September 2013, Hodges engaged in email correspondence with Artzer

and Meyers, inquiring why he did not get the machinist apprentice positions for which he had

applied.[27]  Artzer informed him that he should get some more education or training in the field he

aspired to work as a machinist.  She noted that BNSF was hesitant to promote Hodges because of

his aforementioned transfer request to Missouri.

Ted McKinley, the machinist union local chairman, recommended Hodges to Rickie

Johnson as a candidate for the machinist apprentice position posted in August 2013.  McKinley

testified that when he asked Johnson why Hodges did not get the August 2013 apprenticeship,

---

[27]Doc. 21, Ex. 14.

Johnson responded to the effect that Hodges was not going to get an apprenticeship because of the trouble he had been in, including a derailment incident and statements he had given on the Stemple issue that did not match up or correlate.

*Hodges's Procedural History and Claims*

On November 13, 2013, Hodges filed a complaint with OSHA, alleging that BNSF violated the FRSA by failing to promote him to the position of machinist apprentice, in retaliation for reporting the alleged threats made by Semple to Jones during the March 22, 2013 altercation. OSHA dismissed Hodges's claim on January 24, 2014. He sought review of OSHA's decision before an Administrative Law Judge in the United States Department of Labor. He opted to "kick out" his claim in October 2014, and filed this action in the United States District Court on December 10, 2014.

## III.    Discussion

The FRSA prohibits BNSF from retaliating against its employees who engage in protected activity, which includes 1) reporting a violation of a federal law, rule, or regulation relating to railroad safety or security, and 2) reporting hazardous safety conditions.[28] The FRSA incorporates the rules, procedures and burdens of proof set for the in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistle-blower cases.[29] The "FRSA burden-shifting is more protective of plaintiff-employees than the *McDonnell Douglas* framework."[30]

To establish a prima facie case of retaliation, Plaintiffs must each establish by a preponderance of the evidence that: (1) he engaged in protected activity; (2) BNSF knew that he

---

[28]49 U.S.C. § 20109(a) and (c).

[29]49 U.S.C. § 20109(d)(2)(A)(i)−(ii); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d  152, 157 (3d Cir. 2013).

[30]*Araujo*, 708 F.3d at 158 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

engaged in the protected activity; (3) he suffered an adverse action; and (4) the protected activity

was a contributory factor to the adverse employment action.[31]  If Plaintiff establishes a prima

facie case, the burden shifts to BNSF to show by clear and convincing evidence that it would

have taken the same adverse action in the absence of the protected activity.[32]  "For employers,

this is a tough standard, and not by accident."[33]  The Court discusses Plaintiffs' claims in turn.

### A.  Brian Jones

Jones claims that BNSF retaliated against him for reporting Semple's alleged threat and

obtaining the TRO against Semple.  BNSF argues that Jones has not made a prima facie case of

retaliation under the FRSA.  The Court discusses each element in turn.

### 1.  Protected Activity

Jones contends that he engaged in protected activity under § 20109(a) and (b) by

reporting Semple's alleged threat of violence to BNSF managers, hotline, and police force as

well as to the Shawnee County District Court when he sought and obtained the TRO.[34]

To qualify as a "protected activity" under § 20109(a)(1), the employee must identify a

specific federal law, rule, or regulation related to railroad safety or security that the employee

reasonably believes to be implicated by his complaints.[35]  BNSF argues that seeking and

obtaining a TRO in state court is not a protected activity under the FRSA, as Jones sought

protection under a state law having no explicit relation to railroad safety or security.  As Jones

points out, however, to constitute protected activity, an employee need not make a report of

---

[31]*Id.* at 157.

[32]*Id.*

[33]*Id.* at 159 (citation omitted).

[34]In his response, Jones clarifies that he does not claim that his FRSA complaint is a protected activity. Doc. 24.

[35]*Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 n.3 (8th Cir. 2014).

conduct that is actually a violation of a federal law or regulation, but only that the employee has a reasonable belief that the reported conduct constitutes a violation of a federal rule, law, or regulation related to railroad safety or security.  The Court need not decide this issue, however, as BNSF does not contest that Jones's actions constituted protected activity under his alternative grounds, a report of hazardous safety or security conditions under § 20109(b)(1).  Accordingly, Jones's multiple reports of the March 22, 2013 threat of violence in the workplace by Semple to BNSF management and police force, as well as to the Shawnee County District Court, present a hazardous security condition, and satisfy the protected activity element.

As the parties do not dispute that BNSF knew about Jones's protected activity, the Court proceeds with the next element.

### 2.  Adverse Employment Action

Although there is no dispute as to the disciplinary action taken against Jones, BNSF contends that Jones's suspension with pay does not constitute an adverse employment action.  In retaliation cases, the employer's challenged action must be "materially adverse."[36]  An action is materially adverse if a plaintiff can show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from [engaging in the protected activity]"[37]  BNSF argues that a paid removal from service pending an investigation is not an adverse action.  The Court disagrees.  Here, Meyers testified that he suspended Jones because he thought under the circumstances, it would be unfair to suspend only Semple after the TRO was entered when he was faced with conflicting versions of the March 22, 2013 altercation.  In this context, suspension with pay was clearly considered an adverse employment action.

---

[36]*Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006).

[37]*Id.* at 68.

### 3.   Contributing Factor

Jones contends that presenting the TRO to BNSF was a contributing factor to its decision to suspend him and to commence disciplinary proceedings.  The contributing factor standard has been understood to mean "any factor which, alone or in conjunction with other factors, tends to affect in any way the outcome of the decision."[38]  While the contributing factor standard does not require that the employee "'conclusively demonstrate the employer's retaliatory motive,'" it does require that the employee prove "intentional retaliation prompted by the employee engaging in protected activity."[39]  In other words, while it need not be the determinative factor, an unlawful retaliatory motive−or "discriminatory animus"−must have contributed in some way to the decision.[40]

Discriminatory animus is often shown by circumstantial evidence.  Because Jones does not point to any direct evidence of intentional retaliation, he must rely on circumstantial evidence, which may include temporal proximity, indications of pretext, inconsistent application of an employer's policies, shifting explanations by the employer, or a change in the employer's attitude towards the employee after he engages in protected activity.[41]

While temporal proximity supports this element, more than a temporal connection is required to present a genuine factual issue on retaliation.[42]  "This is especially true when the employer was 'concerned about a problem before the employee engaged in the protected

---

[38]*See Araujo*, 708 F.3d at 158; *see also Lockheed Martin Corp. v Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013).

[39]*Kuduk*, 768 F.3d at 791 (quoting *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)).

[40]*Id.* at 791 n.4.

[41]*Loos v. BNSF Ry. Co.*, No. 13-cv-3373, 2015 WL 3970169, at *5 (D. Minn. June 30, 2015) (citation omitted).

[42]*Kuduk*, 768 F.3d at 792.

activity.'"[43]  Here, Artzer's Internal Investigation report indicates that the investigation into the altercation began before Jones obtained the TRO, when written statements of Jones and Stemple, as well as the two witnesses, were taken.  As noted by BNSF, the altercation took place on a Friday; the weekend passed without incident, and Jones obtained the TRO the following Monday morning and presented to BNSF the next day, whereupon BNSF took immediate action.  This sequence of events belies Jones's claim that BNSF "did nothing" before he obtained the TRO.

Jones offers no further evidence of discriminatory animus.  There is no evidence that BNSF was hostile towards or changed its attitude towards Jones because he obtained the TRO.  In fact, Jones was promoted to his current position of signal maintainer after the protected activity.  BNSF's explanation for the suspension and discipline administered to Jones has never shifted−that Meyers decided to withhold both Jones and Semple from service with pay because there was not enough information about the altercation, and he wanted to be fair to both parties pending further investigation.  The record shows that removing an employee that was part of a workplace altercation pending an investigation was contemplated by BNSF policies and procedures and that Jones's union representative advised him as much.  Jones's argument that his supervisors did not need to remove him from service in order to comply with the TRO in essence requests this Court to sit as a "super-personnel department" to second guess the decisions of the employer.[44]

Moreover, there is no evidence of discriminatory animus with respect to the discipline that Jones ultimately received.  BNSF's explanation has remained constant−that Jones was

---

[43]*Id.* (quoting *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008), *cert. denied*, 528 U.S. 818 (2009)).

[44]*Id.*

disciplined following an investigation hearing convened pursuant to the CBA, where it was

determined that he was a participant in the March 22, 2013 altercation.  The record before the

Court shows that Jones engaged with Semple three times on March 22, including driving a

forklift towards Semple.  Both Jones and Semple were treated the same throughout the

disciplinary process, and ultimately received the same discipline that was the lightest possible

under PEPA.

In sum, Jones has not presented evidence sufficient to support a finding that his protected

activity was a contributing factor to his suspension or discipline.  Thus, Jones has failed to

establish a prima facie case of unlawful retaliation and BNSF is entitled to summary judgment.[45]

**B.  Nick Hodges**

Hodges claims that he was "blackballed" from a machinist apprentice position at BNSF

after he reported Semple's threat of violence to Jones during the March 22, 2013 altercation.

The Court finds there is no serious dispute that Hodges has established a prima facie case:  1)

Hodges engaged in protected activity when he reported to BNSF what he heard Semple tell Jones

on March 22, 2013; 2) failure to promote Hodges is an adverse employment action; 3) Artzer

knew about Hodges's protected activity; and 4) Hodges's reports and testimony were a

contributing factor in BNSF's decision not to promote him in June and September of 2013, as

supported by McKinley's testimony about Johnson's statements.

But even though Hodges has shown that his protected activity contributed in some way to

BNSF's decision not to hire him for the machinist apprentice positions, the Court nonetheless

grants summary judgment to BNSF because it has demonstrated by clear and convincing

evidence that it would have made the same hiring decisions even if Hodges had not engaged in a

---

[45]The Court does not reach the issues of emotional and punitive damages raised by BNSF.

16

protected activity.[46]  Here, the evidence is uncontroverted that Hodges began applying for machinist apprentice positions well before the March 22, 2013 altercation between Jones and Semple.  In early 2012, he interviewed for an open position, but was not selected, in part because he did not have sufficient education and/or experience.  In January 2013, before the altercation, Hodges again applied for an apprentice position and was not hired.  It is undisputed that the applicants selected for the position had more experience, training, and education than Hodges.  Likewise, it is undisputed that after Hodges's reports and testimony about the altercation, the applicants hired for the apprentice positions he applied for were more qualified, with technical degrees and years of experience and training that Hodges lacked working as heavy machinery mechanics.

Moreover, it is undisputed that Artzer testified that BNSF's baseline hiring policy favors two qualities in a candidate for the machinist apprentice position—education and experience.  At all relevant times, Hodges had limited experience working with large equipment, and had no technical training or education.  By contrast, all of the applicants hired for the apprentice positions had years of experience, education, or both.  The record shows that Hodges was not promoted to a machinist apprentice position at the SMT because the position was given to more qualified applicants.[47]

Thus, the undisputed evidence is clear and convincing that, even if BNSF was motivated in part by hostility to Hodges's protected activity, BNSF would not have promoted Hodges for the machinist apprentice positions because he was competing against more qualified candidates.

---

[46]*Kuduk*, 768 F.3d at 789.

[47]Although Hodges was eventually hired as a machinist apprentice in Springfield, there is nothing in the record reflecting the hiring process or the qualifications of other applicants, if any.

For this reason, BNSF is entitled to summary judgment.[48]

**IT IS THEREFORE ORDERED BY THE COURT** that BNSF's Motions for

Summary Judgment (Docs. 16, 19) are GRANTED; Plaintiffs' Complaint is dismissed in its

entirety.

**IT IS SO ORDERED.**

Dated: <u>January 14, 2016</u>

 S/ Julie A. Robinson<br>
JULIE A. ROBINSON<br>
UNITED STATES DISTRICT JUDGE

---

[48]The Court does not reach the back pay and punitive damages issues raised by BNSF.